## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| **MARY K. BARTRUM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO.: 1:06-CV-223** |
| | ) | |
| **MICHAEL J. ASTRUE,**[1] | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Mary K. Bartrum appeals to the district court[2] from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for Disability Insurance Benefits ("DIB"). (Docket # 1.) In short,

because the Administrative Law Judge ("ALJ") improperly discredited Bartrum's testimony that

she needed to elevate her leg while sitting, the Commissioner's decision will be REVERSED and

REMANDED for rehearing.

## I. FACTUAL AND PROCEDURAL BACKGROUND[3]

Bartrum filed a claim for DIB on August 5, 2002, alleging a disability onset date of

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security; therefore, Michael J. Astrue is automatically substituted for Jo Anne B. Barnhart as the Defendant in this case. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d)(1).

[2] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

[3] The administrative record in this case is voluminous (460 pages), and the parties' disputes involve only small portions of it. Therefore, in the interest of brevity, this Opinion recounts only the portions of the record necessary to the decision.

December 18, 2001.[4] (Tr. 43-45.) After her claim was denied initially and upon reconsideration,

Bartrum requested an administrative hearing. (Tr. 29-30, 32-40.) On January 18, 2005, ALJ

Frederick McGrath conducted a hearing at which Bartrum, her mother, her sister, and a

vocational expert ("VE") testified. (Tr. 425-60.) The ALJ then rendered an unfavorable decision

on August 15, 2005. (Tr. 13-28.) The Appeals Council denied Bartrum's request for review,

making the ALJ's decision the final decision of the Commissioner. (Tr. 4-7.) Bartrum filed here

on June 2, 2006, seeking review of the Commissioner's decision, and the matter is now fully

briefed.

At the time of the ALJ's decision, Bartrum was thirty-nine years old and had graduated

from high school and Indiana Business College. (Tr. 17, 43, 62, 432.) Her past employment

experience includes working as a fast food worker, voter registrar, convenience store clerk,

production worker, and newspaper delivery person. (Tr. 119.) She claims she can no longer work

due to multiple sclerosis and hypothyroidism.[5] (Tr. 17, 56.)

## A. Medical Evidence

On July 19, 2002, Bartrum visited Dr. Adil Khan, a neurologist, for an evaluation of her

left leg weakness, difficulty ambulating, and falling. (Tr. 178.) Bartrum reported that five years

prior to the visit, she had a nerve block in her back for left leg numbness and weakness, resulting

in complete resolution of her symptoms for over two years. (Tr. 178.) However, she had noticed

a  recurrence of these symptoms, as well as pain in her entire leg and some color change with

---

[4] The ALJ found, however, that "[t]he earliest onset that can be considered is June 1, 2002, which is when she was no longer engaging in substantial gainful activity . . . ." (Tr. 17.)  Bartrum does not contest this finding.

[5] In her opening brief, Bartrum adds arterial insufficiency of the left leg and post laminectomy to her list of alleged impairments. (Opening Br. of Pl. in Social Security Appeal 2.)

2

mottling of the thigh and foot. (Tr. 178.) She further reported that she drags her left foot when she walks, causing her to fall and injure herself. (Tr. 178.)

On physical examination, Dr. Khan noted increased mottling in Bartrum's left foot and leg, with more pronounced discoloration in the lower extremity. (Tr. 180.) He also observed that her muscle strength was reduced, her left foot was slightly inverted, her coordination was slightly affected in the left lower extremity, her gait was broad-based, she drug her left leg and foot, and she appeared unsteady. (Tr. 180.) On sensory examination, she had decreased perception of pain, temperature, and touch in the left upper and lower extremities, as well as an impaired sense of vibration on her left side. (Tr. 180.) Dr. Khan opined that Bartrum's symptoms suggested a right hemispheric lesion or a more diffuse disease process in the brain involving both hemispheres. (Tr. 181.) Accordingly, he ordered an MRI of her brain to look for lesions. (Tr. 181.)

Bartrum saw Dr. Khan for a follow-up on August 15, 2002. (Tr. 177.) Bartrum reported that she had fallen and injured her shoulder and that as a result, she was using a cane to aid in ambulation. (Tr. 177.) She also complained of excessive tiredness and waking up several mornings with a headache. (Tr. 177.)

Dr. Khan noted that the MRI of Bartrum's brain showed multiple foci of signal abnormalities scattered throughout the white matter of both cerebral hemispheres, which were highly suggestive of a demyelinating disease, and that the MRI of her cervical spine revealed findings consistent with chronic multiple sclerosis ("MS") plaques. (Tr. 177.) As a result, Dr. Khan ordered an "MS work-up," which revealed possible MS. (Tr. 177.) He concluded that Bartrum's new complaints of headaches, fatigue, and exhaustion were most likely related to MS

and ordered additional testing. (Tr. 177.)

Bartrum next visited Dr. Khan on September 12, 2002. (Tr. 172.) She did not complain of any new symptoms other than generalized tiredness, fatigue, and decreased functional capacity, especially when exposed to heat. (Tr. 172.) She also reported that her gait and balance had improved and that she had not fallen since her last visit. (Tr. 172.)

On examination, Dr. Khan noted that Bartrum's muscle strength had improved slightly and that her gait was much improved. He opined that her generalized tiredness, weakness, and numbness all suggest a MS attack; however, since she had completely recovered in the past, he expected her to make good progress with the current attack. Dr. Khan prescribed various drugs for Bartrum's MS and headaches, writing that the MS medications "will certainly reduce the number of attacks and the final outcome and disability of her recurrences." (Tr. 172.)      On October 5, 2002, Bartrum visited Dr. N. Marandet at the request of the Social Security Administration for a consultative physical exam. (Tr. 140-45.) Dr. Marandet noted that Bartrum was able to get on and off the examination table with some slight difficulty, that her gait and station were slightly unsteady, and that she walks in a spastic manner. (Tr. 142.) Bartrum was unable to stand on her heels and toes and was also unable to squat all the way down and rise up; however, she could bend all the way over and get up without difficulty. (Tr. 142.) The neurological examination was mostly normal, except Dr. Marandet noted a slight spasticity in the lower extremities when Bartrum walked. (Tr. 142.)

On November 14, 2002, Dr. J. Sands, a State Agency physician, concluded that Bartrum could occasionally lift and/or carry up to twenty pounds, frequently lift and/or carry ten pounds, and could stand and/or walk at least two hours and sit for about six hours in an eight-hour

workday. (Tr. 147.) He also opined that she could occasionally climb ramps and stairs but could never climb ladders, ropes, and scaffolds. (Tr. 148.) Moreover, he found that she could occasionally balance, stoop, kneel, crouch, and crawl with her lower right extremity but could never perform these activities with her lower left extremity. (Tr. 148.) Finally, he concluded that Bartrum should avoid even moderate exposure to vibration. (Tr. 150.) State Agency physician Dr. R. Wenzler affirmed this opinion. (Tr. 153.)

On November 22, 2002, Dr. Elliot H. Cousins, a vascular specialist, evaluated Bartrum for problems with circulation in her left leg. (Tr. 158.) Dr. Cousins observed that Bartrum's left foot was quite cold and that there was some mild cyanosis that extended up into the region of the calf, which gradually improved when she was in a supine position. (Tr. 159.) Concluding that Bartrum appeared to have significant arterial insufficiency of her left leg due to either occlusive or spasmodic peripheral vascular disease, Dr. Cousins opined that "[o]ne of the most important contributing factors in prevent[ing] distal vasospasm would be for [Bartrum] to quit smoking." (Tr. 159.)

Bartrum followed-up with Dr. Cousins on December 13, 2002, reporting no problems with pain in her foot, although it was intermittently cold. (Tr. 156.) She also confided that she was working with a smoking cessation counselor and was down to a half of a pack of cigarettes a day. (Tr. 156.) Dr. Cousins wrote that continued efforts at smoking cessation were important. (Tr. 156.)

On January 7, 2003, Bartrum followed-up with Dr. Cousins again, reporting that she had made progress in her efforts to quit smoking, that her "quit date" was in about one week, and that and she has gone several days without smoking. (Tr. 155.) Dr. Cousins observed that her foot felt

pinker, that there was less discoloration, and that Bartrum appeared to be making some progress. (Tr. 155.) He encouraged Bartrum in her efforts to quit smoking, concluding that her problem could be managed simply with tobacco cessation. (Tr. 155.)

Bartrum visited Dr. Khan on January 27, 2003, for a four-month follow-up, confiding that she was no longer working and was in better health as a result, that she would be starting to take Avonex injections for her MS, that she had recently quit smoking, and that her headaches had improved significantly since starting the medication he prescribed. (Tr. 170.) Upon examination, Dr. Khan noted that her muscle strength was slightly better and that her gait was much improved, advising her to follow-up in four months. (Tr. 170.)

Upon referral from Dr. Cousins, Bartrum saw Dr. Rosemarie M. Jeffery, a rheumatologist, on February 10, 2003. (Tr. 162-65.) Bartrum admitted that she is a smoker and that although she had been smoking as much as two packs a day, she had cut down to about a third of a pack a day. (Tr. 162.) She complained of fatigue and chronic headaches, which tend to get worse after taking Avonex. (Tr. 163.) Upon examination, Dr. Jeffery observed that Bartrum's left leg and foot were discolored and that her left foot felt somewhat cooler than the right, noting that these changes were brought on when Bartrum sat with her legs hanging from the exam table. (Tr. 162.) Dr. Jeffery's impressions included livido reticularis, which is a sign of poor circulation found frequently in smokers. (Tr. 164.)

On February 19, 2003, Dr. Khan wrote a letter addressed simply "To Whom It May Concern" stating: "[Bartrum's] multiple sclerosis is manifested with symptoms of fine finger incoordination, numbness, generalized tired[ness] and weakness in her legs.  Due to these symptoms, I feel [Bartrum] is unable to work at any gainful employment." (Tr. 169.)

6

Bartrum next visited Dr. Khan for her four-month follow-up on May 28, 2003. (Tr. 241.) She reported that her tiredness and fatigue had improved but that she continued to have lower extremity weakness, difficulty walking, and increased redness. (Tr. 241.) Dr. Khan observed that her muscle strength was slightly better, that her gait was much improved, and that she was tolerating Avonex very well. (Tr. 241.) He advised her to return for a follow-up appointment in four to six months. (Tr. 241.)

Upon the recommendation of Dr. Khan, Bartrum attended eleven physical therapy sessions from June 3, 2003, to July 31, 2003. (Tr. 398-420.) On initial evaluation, Bartrum reported that she was able to independently perform the following activities: bathing, feeding, dressing, meal preparation, and laundry; thus, she was not recommended for occupational therapy. (Tr. 399-401.) Eventually, she was fitted for an AFO brace, which resulted in improved gait and balance. (Tr. 404-05, 409.) Upon discharge, all of her goals were met. (Tr. 404.)

On July 25, 2003, Bartrum visited Dr. Cousins, who noted that Bartrum's carbon monoxide levels suggested that she continued to smoke, that her foot looked fairly pink, and that she was experiencing much less pain. (Tr. 244.) He also wrote: "[t]here is really nothing else that we have to offer her at this point.  I have tried to reiterate to her the importance of tobacco cessation since I suspect that if she continues to smoke, she will eventually come to an amputation." (Tr. 244.)

On November 18, 2003, Bartrum saw Dr. Khan for a follow-up, complaining of bilateral heel pain, which made walking difficult, and left visual disturbances with dizziness. (Tr. 240.) On physical examination, Dr. Khan observed that Bartrum had a brace on her left foot and that, as a result, her left foot was no longer inverted and her gait had improved. (Tr. 240.) However,

he also noted a new onset of left upper extremity symptoms, ordering a repeat MRI of the brain to look for any progression of MS and an EMG and nerve conduction study to evaluate her heel pain and lower extremity weakness. (Tr. 240.) Dr. Khan again advised her to follow-up in four to six months. (Tr. 240.)

Bartrum visited Dr. Khan on April 19, 2004, reporting that her symptoms had worsened. (Tr. 238.) Specifically, she complained that she has had two flare-ups involving her eyes, has experienced increased clumsiness and falls, has resumed using a cane for stability, has sharp stabbing pains in her head along with throbbing, and was experiencing tiredness and fatigue. (Tr. 238.) Dr. Khan noted that the EMG and nerve conduction study were normal and that the MRI revealed no significant changes; however, he also observed that her gait was unsteady and wobbly, that the left side of her mouth and upper lip were drooping, and that the visual acuity in her right eye had decreased. (Tr. 238.) He concluded that Bartrum's MS might have recently flared up, advising her to follow-up in six months. (Tr. 238.)

Less than one month later, on May 13, 2004, Bartrum again visited Dr. Khan, complaining of throbbing in her legs from the hip down that had recently worsened. (Tr. 237.) Confiding that it hurt to move or walk, she reported pain over her whole body, which was most pronounced in her legs. (Tr. 237.) She also indicated that the symptoms on her right side had worsened, particularly in her right leg, and that her left arm was feeling heavy. (Tr. 237.) Finally, she complained of constant, dull headaches but that the stabbing headaches had improved since taking prescription medication. (Tr. 237.) On physical examination, Dr. Khan observed drooping on the left side of her face and that the muscle strength in her left extremities was worse than in her right extremities. (Tr. 237.)  He concluded that she might be experiencing an exacerbation of

her MS, ordering a repeat MRI of her brain and physical therapy with balance training. (Tr. 237.)

Dr. Khan saw Bartrum again just one week later, on May 20, 2004, noting that the MRI showed multiple new plaques and an enhancing lesion within the left parietal lobe. (Tr. 236.) Based on the MRI, he concluded that Bartrum had experienced an exacerbation of her MS. (Tr. 236.) He switched her medication from Avonex to Rebif, advising her to follow-up in a few weeks. (Tr. 236.)

Subsequently, Bartrum visited Dr. Khan on June 17, 2004, reporting that she was doing well and had no major problems. (Tr. 234.) Accordingly, Dr. Khan advised her to follow-up in six months. (Tr. 234.)

Upon referral of Dr. Khan, Bartrum visited Dr. Rudy Kachmann, a neurosurgeon, on October 18, 2004. (Tr. 370.) She complained of low back pain, right and left leg pain, and tingling and numbness in her feet and legs, especially when walking. (Tr. 370.) Noting that an MRI indicated lumbar stenosis of a mild to moderate nature at L3-4 and L4-5, Dr. Kachmann concluded that her symptoms were a combination of fibromyalgia and lumbar stenosis. (Tr. 370.) Although Dr. Kachmann decided to treat her conservatively for another few weeks (Tr. 370), he ultimately performed a laminectomy at L4-L5 for lumbar stenosis on November 5, 2004. (Tr. 366.) Bartrum was discharged the next day with good relief of her symptoms. (Tr. 319.)

### B. Administrative Hearing Testimony

At the hearing, Bartrum testified that when she worked at the voter registration office, they accommodated her illness by allowing her to leave early at least every other week when she was having a bad day, was tired, or was prone to falling. (Tr. 437.) According to Bartrum, the office also permitted her to prop up her leg, explaining that if she leaves her leg hanging down

9

over a chair, "the circulation in it is so bad that it turns . . . plum purple," but that "as long as

[she] can keep it stretched out, the circulation then flows right through." (Tr. 435.) She further

testified that her foot gets "extremely cold[] [a]nd hard to walk on," stating that when she is at

home she sits on the couch with her leg stretched out "all the time." (Tr. 436.)

Subsequently, Bartrum's attorney asked the VE if the number of jobs that Bartrum could

perform would be reduced by her alleged need to keep her leg elevated the majority of the day.

The VE responded:

> [T]he question . . . would be, how far it's elevated. And if it has to be elevated
> above her . . . heart level, then that would make it impossible for her to ever reach
> forward. It . . . essentially eliminate[s] jobs. If it was just [that] she had to have
> her foot elevated such as on a – well, perpendicular o[r] lower, then I think it
> would have some impact, approximately a 25 percent erosion of . . . the number
> of jobs.

(Tr. 459.)

## II. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are

supported by substantial evidence, which means "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th

Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by

substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d

863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative

record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

### III. DISCUSSION

### A. Legal Framework

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether Bartrum is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of

performing work in the national economy.[6] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## B. The ALJ's Decision

In a written decision issued on August 12, 2005, the ALJ determined that Bartrum was not disabled. (Tr. 16-28.) The ALJ decided in Bartrum's favor on steps one and two, finding that her MS, hypothyroidism, and status post lumbar laminectomy were severe impairments; however, he found at step three that she did not meet a listing. (Tr. 27.) He then ascertained that Bartrum had the following RFC:

> [S]he is otherwise able capable of performing sedentary work activities as defined in 20 C.F.R. § 404.1567, except that she can do no climbing of ropes, ladders, scaffolds, ramps, and stairs; avoid moderate exposure to vibration; no work at unprotected heights or around dangerous machinery; no more than occasional bending and twisting; and she can do no work tasks where driving is required. She can be around employees throughout the workday, but only occasional (less than one-third of the workday) conversations and interpersonal interaction. She is limited to the performance of unskilled work.

(Tr. 27.)

Based on this RFC, the ALJ found at step four that Bartrum was unable to perform any of

---

[6] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

her past relevant work; however, he found at step five that there are a significant number of jobs in the national economy that she could perform, including a semiconductor bonder, wafer breaker, and die loader. (Tr. 27-28.) Therefore, Bartrum was not entitled to DIB. (Tr. 28.) In reaching this decision, the ALJ found that Bartrum's allegations regarding her limitations were not totally credible. (Tr. 27.) Moreover, the ALJ gave "substantial weight" to the opinions of the Bureau of Disability Determination medical consultants, while finding the opinion of Dr. Khan that Bartrum was unable to work internally inconsistent. (Tr. 23-24.)

In arguing that a remand is required, Bartrum maintains that the ALJ improperly evaluated her symptom testimony and the opinion of Dr. Khan. Ultimately, the ALJ's determination that "[t]he medical evidence does not support [Bartrum's] alleged need to elevate her legs while sitting" (Tr. 23) necessitates a remand of the ALJ's credibility determination.

### C. The ALJ's Credibility Determination Will Be Remanded

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

13

Here, the ALJ found that the "alleged severe and debilitating nature of [Bartrum's] subjective complaints" was not fully credible, providing numerous reasons for his finding,[7] including that "[t]he medical evidence does not support the claimant's alleged need to elevate her legs while sitting." (Tr. 23.) This assessment is "patently wrong," *Powers*, 207 F.3d at 435, as there are at least two entries in Bartrum's medical record supporting her alleged need to elevate her left leg. First, when Dr. Cousins initially evaluated Bartrum for problems with circulation in that leg, he specifically observed that her left foot was quite cold and that there was some mild cyanosis extending up into her calf, *which gradually improved when she was in a supine position*. (Tr. 159.) In addition, Dr. Jeffery noted in her evaluation that Bartrum's left leg and foot were discolored and that the left foot felt somewhat cooler than the right, noting that

---

[7] More specifically, when discrediting Bartrum, the ALJ wrote:

In September 2002, Dr. Khan reported that the claimant had more than one recurrence of MS, but since she had completely recovered in the past, she was expected to make good progress with the current attack. She has benefited [sic] with medication management (Avonex and more recently Rebif) and her gait and balance are both improved with use of an AFO brace. In May 2003, the claimant reported improvement in her tiredness and fatigue. In November 2003, her gait appeared steady without the use of a cane. There was no inversion of the left foot. It was noted by Dr. Khan on June 17, 2004 that the claimant was doing good on the Effexor and Rebif with no major problem. The claimant underwent a lumbar laminectomy in November 2004 and thereafter she had good relief of her symptoms. She is treated symptomatically with medications for headaches and urinary incontinence. There is no recommendation for more aggressive management. The medical evidence does not support the alleged frequency of the headaches, and she has not sought emergency medical attention. Dr. Khan is basically following-up with the claimant every four to six months, as long as she remains stable. The medical evidence does not support the claimant's alleged need to elevate her legs while sitting. There is no mention that she is experiencing medication side effects. There is no mention that she needs to nap every day as she alleges. She is independent in all activities of daily living, such that she was not recommended for occupational therapy services. The claimant's cognition and ability to follow directions are both termed excellent. She is not driving because she does not have a car, and not as a result of her impairments. No medical source has instructed the claimant not to drive. She continues to smoke cigarettes, despite her alleged circulatory complaints. A vascular specialist had nothing else to offer the claimant, and in July 2003 her foot looked fairly pink and she was experiencing much less pain.

(Tr. 23 (citations omitted).)

Bartrum attacks many of the ALJ's reasons for discrediting her, asserting eleven grounds for why she believes he improperly evaluated her credibility. Although most of her arguments are unconvincing, it is unnecessary to detail each of them, as the Court concludes that at least one of her arguments necessitates a remand.

these changes were brought on *when Bartrum sat with her legs hanging from the exam table*. (Tr. 162.) Although neither doctor explicitly states that Bartrum needs to elevate her left leg (and therefore offers no opinion regarding how high or how often she needs to elevate it), such evidence obviously provides support to Bartrum's allegations. Thus, the ALJ's basis for summarily discrediting Bartrum regarding her need to elevate her leg was patently wrong.

While the Court notes that the ALJ provided a number of other valid reasons for discrediting Bartrum's testimony, it cannot deem this specific error harmless, as it could have an impact on the ALJ's step five determination that there were a significant number of jobs that Bartrum could perform. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (concluding that an ALJ's error was harmless when it "would not affect the outcome of the case" (citing *Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003))). To explain, the VE testified that if Bartrum needs to elevate her leg above heart level, there would be no jobs available, and if she needs to her elevate her leg "perpendicular" or lower, the number of jobs she could perform would be eroded by twenty-five percent.

Although the record does not indicate how high Bartrum allegedly needs to elevate her leg, even if the Court assumes that her leg needs to be elevated only at a lower level, it is unclear whether the resulting twenty-five percent reduction in the number of jobs leaves a "significant" number of jobs such that she is still not considered disabled at step five.[8] *See* 20 C.F.R. § 404.1566(b) ("Work exists in the national economy when there is a significant number of jobs

---

[8] To explain, as noted *supra*, Part III.B, the ALJ found at step five that Bartrum was able to perform work as a semiconductor bonder, wafer breaker, and die loader. The VE testified that there are approximately 500 of these jobs in the regional economy, a number which the ALJ found to be significant. (Tr. 25, 28, 456.) Accordingly, a twenty-five percent reduction in this number equals 375 jobs in the regional economy that Bartrum could perform. Whether 375 jobs is "significant" under 20 C.F.R. § 404.1566(b) is a determination best left to the ALJ on remand, should he decide to credit Bartrum's testimony regarding her need to elevate her leg.

(in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications."). Thus, because Bartrum's alleged need to elevate her leg could potentially affect the outcome of the case by reducing the number of jobs she is able to perform to a level requiring a finding of disability at step five, the ALJ's credibility determination must be remanded.[9]

## IV. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is REVERSED and the case is REMANDED to the Commissioner for further proceedings in accordance with this opinion. The Clerk is directed to enter a judgment in favor of Bartrum and against the Commissioner.

SO ORDERED.

Enter for July 19, 2007.

S/ Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge

---

[9] Accordingly, it is unnecessary to discuss at length Bartrum's second argument for remand, that is, that the ALJ improperly evaluated Dr. Khan's opinion that she was unable to work. However, insofar as Bartrum asserts that the ALJ committed legal error under SSR 96-2p, the Court notes that this Ruling is inapplicable, as it explains the circumstances under which a treating physician's *medical opinion* is entitled to controlling weight. *See* SSR 96-2p. In contrast, a treating physician's opinion on issues reserved to the Commissioner, such as whether a claimant is able to work, is not a medical opinion and is therefore "never entitled to controlling weight or special significance." SSR 96-5p; *see also* 20 C.F.R. §§ 404.1527(e), 416.927(e).

Moreover, the ALJ rejected Dr. Khan's opinion in favor of giving substantial weight to the State Agency medical consultants, and it is not the job of this Court to resolve the conflicts among those opinions. *See Clifford*, 227 F.3d at 869. Indeed, much of Bartrum's argument concerning Dr. Khan's opinion consists of nothing more than an invitation to re-weigh the evidence, which this Court must decline. *See id.*